# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

TINA MARCINEK,⁣           )
         Plaintiff,      )
                     )
     v.               )     CAUSE NO.: 2:11-CV-315-PRC
                     )
MICHAEL J. ASTRUE,     )
Commissioner of the Social Security  )
Administration,           )
         Defendant.    )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Tina Marcinek on August 29, 2011, and on Plaintiff's Brief in Support of Her Motion to Reverse the Decision of the Commissioner of Social Security [DE 20], filed on February 7, 2012. Plaintiff requests that the Administrative Law Judge's decision to deny her disability benefits and supplemental security income be reversed or, alternatively, remanded for further proceedings. On April 18, 2012, the Commissioner filed a response, and on May 11, 2012, Plaintiff filed a reply. For the reasons set forth below, the Court denies Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On January 18, 2008, Plaintiff filed an application for a period of disability, seeking disability insurance benefits and supplemental security income and alleging an onset date of December 30, 2006. Plaintiff's application was denied initially on April 2, 2008, and subsequently upon reconsideration on August 20, 2008. Plaintiff filed a timely request for a hearing, which was held before Administrative Law Judge ("ALJ") Sherry Thompson on June 8, 2010. In appearance were Plaintiff, her attorney Thomas J.Scully, and vocational expert ("VE") Thomas A. Grzesik.

On August 9, 2010, the ALJ issued a decision denying Plaintiff's application. The ALJ made

the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2. The claimant has not engaged in substantial gainful activity since December 30, 2006, the alleged onset date (20 CFR 404.1571 et seq. and 416.971 et seq.).

3. The medical evidence establishes that the claimant has congenital heart disease. These medically determinable impairments cause significant limitations in the claimant's work related functioning and are, therefore, severe within the meaning of the Regulations (20 CFR 404.1520(c) and 416.920(c)).

4. Based on objective medical evidence in the record and the DDS reviewers (Exhibit), I conclude that the claimant does not have an impairment or combination of impairments that meet or medically equal the requirements of any listed impairment in Appendix 1, Subpart P, Regulations No. 4, specifically when considered under Listing 4.04 (20 CFR and 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the evidence of record as a whole supports a finding that the claimant retains the residual functional capacity to perform the exertional and nonexertional requirements of work, except for that more exertionally demanding than light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequently lifting and/or carrying 10 pounds; occasionally lifting and/or carrying 20 pounds; and standing, walking, and sitting, each for about 6 hours in an 8 hour workday. Other limitations include: occasional climbing of ramps or stairs; occasional kneeling, crouching, and crawling; no climbing of ropes, ladders, or scaffolds; frequent balancing, stooping; and no concentrated exposure to extreme cold temperatures.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on [ ], 1973 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 30, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 11-18.

Plaintiff sought review of the ALJ's decision. However, on July 14, 2011, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

### A. Medical Background

As of the date of the hearing, Plaintiff was 37 years old. Plaintiff was diagnosed with a congenital heart defect–Tetralogy of Fallot. As a result, she underwent open-heart surgery to repair the defect in 1975, and, in January 2007, Plaintiff underwent open-heart surgery for a resection of the right ventricular outflow tract muscle bundles and pulmonary valve insertion.

In 2002, Plaintiff complained of severe headaches.

On July 22, 2004, Plaintiff underwent an echocardiogram. She reported clinical symptoms of angina, chest pain (etiology unknown), dizziness, symptoms of failure (shortness of breath, orthopnea, paroxysmal nocturnal dyspnea), syncope, palpitations, and fever.

In August 2004, Plaintiff reported sudden onset of chest pain, palpitations, and anxiety.

On June 2, 2005, Plaintiff underwent an echocardiogram. The report noted the same clinical symptoms as the July 22, 2004 echocardiogram.

On April 18, 2006, Plaintiff reported chest pain and underwent a chest x-ray. The report noted a clinical history of left chest pain. The opinion of the radiologist was that the "heart is upper normal to borderline enlarged without overt failure" and "no active cardiopulmonary process seen." AR 273. On April 28, 2006, a Cardiology Stress Echo showed negative stress echo for ischemia, normal left ventricular systolic function, no chest pain.

On May 1, 2006, Plaintiff reported that her chest pain was resolved.

In August 2006, Plaintiff presented to her physician with complaints of headache and congestion.

On October 5, 2006, Plaintiff presented with chest pain and shortness of breath and underwent a chest x-ray. The impression was no active cardiac or pulmonary disease with evidence of old granulomatous disease. On October 9, 2006, Plaintiff reported that her chest pain was resolved.

On October 23, 2006, Plaintiff reported chest pain, and a cardiac consultation was scheduled.

In November 2006, Philip Ludbrook, M.D. sent a letter to Plaintiff's regular physician after a referral for evaluation of worsening shortness of breath on exertion. He noted that Plaintiff reported that five years earlier she was doing well but that for the preceding several months, she

reported having increasing shortness of breath on exertion. He noted that Plaintiff also reported a fifteen-pound weight gain, orthopnea, and two episodes of paroxysmal nocturnal dyspnea ("PND") in the prior month. Plaintiff also reported episodes of chest heaviness associated with shortness of breath on exertion. Plaintiff reported some occasional palpitations but denied any syncope or lightheadedness. Dr. Ludbrook recommended follow-up after diagnostic tests.

In a December 8, 2006 Cardiac Catheterization Report, Dr. Ludbrook included the same clinical reports by Plaintiff regarding her history as in the November 2006 letter. The therapeutic recommendation was that Plaintiff had "significant pulmonary valve and subvalvular obstruction and moderate pulmonary regurgitation. The right ventricle is moderately dilated, with fair residual systolic function." AR 384. Dr. Ludbrook indicated that "[c]onsideration will be given to pulmonary valve replacement." *Id.*

In January 2007, Plaintiff underwent the open-heart surgery for a resection of the right ventricular outflow tract muscle bundles and pulmonary valve insertion.

On March 19, 2007, Plaintiff reported no chest pain, shortness of breath, or edema.

Later in March 2007, Plaintiff presented at Massac Memorial Hospital with complaints of numbness and tingling in her left arm and chest discomfort. She was diagnosed with anemia and was instructed to follow-up with her regular physician regarding the anemia and with her cardiologist as scheduled.

A March 23, 2007 x-ray reported a clinical history of chest pain. The impression was "mild cardiomegaly without evidence of active pulmonary disease." AR 397.

On March 26, 2007, Plaintiff reported tingling and numbness in her left arm. She reported no chest pain. On March 29, 2007, Plaintiff was prescribed iron pills for her anemia.

On April 17, 2007, Plaintiff was again diagnosed with anemia. She reported chest pain.

On April 24, 2007, no complaint of chest pain was made. She reported that she was less tired.

On May 23, 2007, Plaintiff reported her fatigue was improving. Her weight gain continued to be reported. Her cardiac status was listed as stable.

On July 11, 2007, she reported fatigue and weight gain and that her shortness of breath was "resolved." AR 420. It was also noted that her anemia was corrected, with continued treatment, that there was no shortness of breath, and that she was stable for "cardiopulmonary." *Id.*

On February 27, 2008, J. Smejkal, M.D. performed a consultative examination for the disability determination bureau. Plaintiff's chief complaints were listed as congenital heart disease, S/P open heart surgery, fatigue, and shortness of breath. Plaintiff reported chest pain on the left side with a tightness feeling, shortness of breath, and pain that radiates to the left arm with tingling in the lower part of her arm. She reported being fatigued all the time and having shortness of breath easily. She reported that she was diagnosed with anemia and was on iron pills. The cardiovascular exam noted chest pain and shortness of breath on exertion with no irregular heartbeat, tachycardia, or edema associated with dyspnea. Dr. Smejkal did not have medical records to review. His impressions were Tetralogy of Fallot, S/P open heart surgery in 1975 and 2007, H/O chronic fatigue, and shortness of breath.

A physical residual functional capacity assessment ("RFC") was completed by B. Whitley, M.D. on April 2, 2008. Dr. Whitley found Plaintiff capable of occasionally lifting twenty pounds, frequently lifting 10 pounds, standing or walking for a total of six hours in an eight-hour workday, sitting for six hours in an eight-hour work day, and unlimited push and pull. As for postural

limitations, Dr. Whitley found Plaintiff could frequently balance and stoop; occasionally climb ramp/stairs, kneel, crouch, and crawl; and never climb ladder/rope/scaffolds. Dr. Whitley found that Plaintiff should avoid concentrated exposure to extreme cold. Dr. Whitley noted that Plaintiff had not had regular follow up with her cardiologist recently. Dr. Whitley found Plaintiff to be "partially credible as allegations are out of proportion to objective ME." AR 439. On August 19, 2008, J.V. Corcoran, M.D. affirmed Dr. Whitley's opinion.

On April 4, 2008, Plaintiff presented to Harish A. Shah, M.D., F.A.C.C. for follow up on her heart surgery after moving to Northwest Indiana. She denied chest pain, shortness of breath, orthopnea, or paroxysmal nocturnal dyspnea. She denied palpitations, syncope, or pre-syncope. She denied transient ischemic attack. Dr. Shah's impression was S/P Tetralogy of Fallot repair and a murmur in the pulmonic and aortic area (suspecting it might be a murmur of ASD). The plan was to continue current medications. An echocardiogram was ordered.

On June 11, 2008, Plaintiff was seen by Dr. Shah for follow up. She again denied chest pain, shortness of breath, orthopnea, paroxysmal nocturnal dyspnea, palpitations, syncope, pre-syncope, and transient ischemic attack. Dr. Shah noted that the "echocardiographic study reveals normal left ventricular systolic and diastolic function, right ventricular systolic and diastolic dysfunction, and right ventricular enlargement, severe pulmonic and moderate tricuspid regurgitation with pulmonary hypertension." AR 451. Dr. Shah's impression was the same as on April 4, 2008. He recommended follow up in three months.

On September 2, 2008, Plaintiff underwent a chest x-ray, a stress test, an echocardiogram, and a head CT. The chest x-ray impression was mild cardiomegaly and postsurgical chest changes. The impression of the stress test was "no reversible segmental ischemic changes. Focal fixed apical

thinning. Likely normal variant. No other segmental defects. Low normal left ventricular ejection fraction of 51%. Moderate hypokinesis of the septum. Prominent tracer uptake in the right ventricle suggestive for hypertrophy." AR 456-57. The head CT impression was "Inflammatory changes in the paranasal sinuses. Examination is otherwise unremarkable." AR 457. The results of the echocardiogram provided that the left ventricle is normal in size, there was normal overall left ventricular systolic function, there was normal left ventricular wall thickness, there was no obvious regional wall motion abnormalities, and there was no thrombus. It also showed that the right ventricle was mildly dilated, there was normal right ventricular systolic function, and there was mild right ventricular hypertrophy. There was normal left and right atrial size. The aortic valve was normal in structure and there was no aortic regurgitation present. There was mild mitral annular calcification and mild mitral regurgitation. The tricuspid valve was normal in structure and function, and there was moderate tricuspid regurgitation. There was mild thickening of the pulmonic valve, increased pulmonic valve velocity, and mild to moderate pulmonic valvular regurgitation. The aortic root was normal in size; the pulmonary artery was not well visualized but was "probably normal size." AR 460. Doppler parameters suggested abnormal diastolic function for age. There was no pericardial effusion and no pleural effusion.

On November 12, 2008, Plaintiff was seen for follow up by Dr. Shah. Plaintiff again denied chest pain, shortness of breath, orthopnea, paroxysmal nocturnal dyspnea, plapitations, syncope, pre-syncope, and transient ischemic attack. Dr. Shah noted that her September 2008 stress test was negative. Dr. Shah's impression was s/p Tetralogy of Fallot, a murmur in the aortic area, anemia, and taking iron pills.

On March 25, 2009, Plaintiff was seen for follow up by Dr. Shah. Plaintiff again denied chest pain, shortness of breath, orthopnea, paroxysmal nocturnal dyspnea, palpitations, syncope, pre-syncope, and transient ischemic attack. However, Plaintiff complained of increasing fatigability and tiredness. Dr. Shah's impression was the same as on November 12, 2008.

Plaintiff's body weight fluctuated between 155 and 170 pounds at five feet tall.

## B. Plaintiff's Testimony

Plaintiff testified that she has chest pain two to three times a week, which she relieves by lying down. She testified that she naps frequently every day, for a total of four or five hours a day. She has no problems sleeping at night. She testified that about once or twice a month she has pain that feels "heavy," like an elephant is sitting on her chest, and that she cannot catch her breath. To relieve this feeling, she lies down, and the heavy feeling lasts about fifteen minutes.

She testified that she has no side effects from the iron pills other than a little heartburn.

Plaintiff testified that she gets tired quickly and that she gets lightheaded when she stands up and sits down. She testified that she had been having dizziness for about four or five months prior to the hearing.

Plaintiff testified that she has some pain in her left arm into her fingertips, with a feeling like it was "asleep." Plaintiff further testified that she would get short of breath, for example by vacuuming, standing up too quickly, or sometimes walking. It takes her fifteen to twenty minutes to recover from her shortness of breath.

Plaintiff testified that she has headaches three to four times a week that last for four hours. To relieve the headaches, she puts a cold rag on her face and lies down. She testified that she does not know the origin of her headaches.

### C. ALJ's Decision

The ALJ found that Plaintiff had the severe impairment of congenital heart disease but that it did not meet or equal a listed impairment. The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b), with the limitations that she only occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, occasionally climb ramps or stairs, occasionally kneel, crouch, and crawl, never climb ropes, ladders, or scaffolds, that she frequently balance or stoop, and that she avoid concentrated exposure to extreme cold.

The ALJ found that Plaintiff's medically determinable impairment could reasonably be expected to cause the symptoms she complained of but that her testimony was not credible because her complaints were not substantiated in the record. The ALJ further found that Plaintiff was only credible to the extent that her allegations were consistent with the RFC. Finally, the ALJ found that there were jobs in the national economy that Plaintiff is capable of performing, including office helper (DOT # 239.566-10), dining service worker (DOT # 319.484-010), and order clerk (DOT #209.567-014).

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to [her] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*,

362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no,

then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite [her] limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id.* at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that the ALJ committed reversible error by improperly relying on the State Agency Physician's Opinion and failing to obtain an updated opinion in violation of Social Security Ruling 96-6p, by failing to demonstrate proper consideration of the evidence of Plaintiff's impairments in the RFC analysis, and by improperly determining Plaintiff's credibility. The Commissioner responds that substantial evidence in the record supports the ALJ's decision. The Court considers each argument in turn.

### A. State Agency Physician's Opinion–Social Security Ruling 96-6p

Plaintiff argues that the ALJ's decision was improper because she relied on the opinion of the state agency physician, Dr. Whitley, who failed to consider all of Plaintiff's impairments or all

of the medical evidence in the record because some of the evidence of record occurred after the date of Dr. Whitley's residual functional capacity ("RFC") assessment for light work.

Dr. Whitley gave the RFC assessment on April 2, 2008. Two days later, on April 4, 2008, Plaintiff began seeing cardiologist Dr. Shah, as Plaintiff had recently moved to the Northwest Indiana region. (Her January 2007 open heart surgery took place in St. Louis, Missouri). The subsequent medical evidence consists of the treatment reports for four visits to Dr. Shah dated April 4, 2008, June 11, 2008, November 21, 2008, and March 25, 2009 as well as the September 2, 2008 chest x-ray, stress test, echocardiogram, and head CT.

Social Security Ruling 96-6p, which addresses an ALJ's consideration of findings of fact by a state agency medical consultant for the purposes of medical equivalence, provides that, when an ALJ finds that "an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant." SSR 96-6p, 1996 WL 374180, *3 (July 2, 1996). However, the Ruling goes on to provide that the ALJ must obtain a medical opinion from a medical expert "[w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id*. at *4; *see also Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1004 (N.D. Ill. 2010) (recognizing that SSR 96-6p applies in situations in which there is new evidence of an impairment after a claimant's records have been evaluated by a state agency physician, finding that the state agency physician had not considered the issue of equivalence for the plaintiff's hepatitis C because the physician examined the plaintiff or his records prior to the

hepatitis C diagnosis, finding that the ALJ did not discuss whether the new evidence would change the earlier opinion, and finding it unreasonable that a diagnosis of hepatitis C, which the ALJ found to be severe, would not have changed the state agency physician's finding of equivalence when the doctors had never considered the disease in the first place).

In her decision in this case, the ALJ sufficiently explained why she found it unnecessary to obtain additional medical expert opinion notwithstanding the new medical records, namely that, in the ALJ's opinion, the additional medical evidence would not have changed Dr. Whitley's opinion. In her written decision, the ALJ directly acknowledged Plaintiff's current argument, noting that counsel argued at the hearing that Dr. Whitley's RFC assessment was greater than two years old and that Plaintiff had not seen a cardiologist at the time of Dr. Whitley's assessment. The ALJ went on to recognize that the additional medical evidence submitted by Plaintiff included the treatment records through March 25, 2009. The ALJ analyzed these additional records, noting that they show that Plaintiff "is doing fine, with no subjective complaints or objective findings of shortness of breath, chest pain, orthopnea, or PND" and that her complaints were of fatigue and tiredness. The ALJ also noted that since that time, the cardiologist had not prescribed any medication for Plaintiff other than the iron pills for her anemia. Unlike in *A.H. ex rel. Williams v. Astrue*, in which the ALJ made independent medical findings regarding medical evidence acquired after the medical experts' opinions and did not "account for substantial portions of the medical evidence in the record," the ALJ in this case sufficiently addressed the very evidence identified by Plaintiff and did not make independent medical findings. No. 09 C 6981, 2011 WL 1935830, *21 (N.D. Ill. May 18, 2011).

The Court's review of the same medical evidence also reveals that, despite diagnostic testing results that demonstrated grade 3-4/6 systolic murmur, a bilateral conducted murmur in the pulmonic

and aortic areas, severe pulmonic and moderate tricuspid regurgitation, decreased left ventricular chamber size that suggested right ventricular hypertrophy, moderate hypokinesis of the septum, wall thinning, and problems with her tricuspid and pulmonic valves, the clinical findings based on Plaintiff's own reports showed that Plaintiff repeatedly denied any shortness of breath, chest pain, orthopnea, PND, palpitations, syncope, pre-syncope, or transient ischemic attack and that her primary complaint was fatigue and tiredness. *See* AR 444, 446, 450-60. At the November 2008 and March 25, 2009 visits, Plaintiff reported that she felt fine. These were the clinical findings notwithstanding Plaintiff's initial indication on her "Patient Health History" form for Dr. Shah that she had chest pains and shortness of breath when she exerts herself, when walking against the wind, when walking up a hill, when upset or excited, when doing her regular work, and when climbing a flight of stairs.

Although Plaintiff contends that Dr. Whitley did not consider many records, many of the records she cites predate Dr. Whitley's opinion and, thus, would have been before him for consideration. *See* AR 315, 217, 403-04, 417, 427-28, 431. In fact, one of the record citations she asserts that Dr. Whitley did not consider is explicitly cited in Dr. Whitley's report. *See* AR 215, 435.

Plaintiff also argues that Dr. Whitley did not consider all of her impairments, including her complaints of chronic fatigue, anemia, or her medical diagnostic results demonstrating the severity of her cardiovascular impairments such as moderate pulmonary regurgitation, moderate hypokinesis of the septum, 3-4/6 systolic and diastolic murmurs, and cardiomegaly, citing AR 215, 217, 232, 403-04, 417, 427-28, 431, 444, 446, 450-560. In other words, Plaintiff argues that Dr. Whitley did not take into account Plaintiff's combination of impairments. As noted above, Dr. Whitley did have

most of those records for his review, and the ALJ did not err in finding that additional expert opinion was unnecessary.

As for her anemia, Plaintiff was treated with iron pills, and her doctors concluded that the management of her condition with iron pills was sufficient. In November 2008 and March 2009, Dr. Shah noted her anemia and recommended continuing the course of iron pills. On April 24, 2007, she reported to her physician that she was less tired, and on May 23, 2007, she reported that her fatigue was improving. On July 11, 2007, Plaintiff's treating physician noted "anemia - corrected - will continue [with] treatment." AR 420. However, at the consultative examination, Plaintiff did report that she was fatigued all the time. Thus, although Plaintiff was diagnosed with several heart-related symptoms, her reports to Dr. Shah throughout 2008 and into 2008 belie her current claims and, thus, do not undermine the ALJ's decision that an additional medical opinion was unwarranted.

Plaintiff faults Dr. Whitley's assessment because he noted that she was not seeing a cardiologist at the time of the assessment, but shortly afterwards, she underwent extensive testing with Dr. Shah, a cardiologist. At the end of Part I.A, which addressed "exertional limitations" on page 2 of the RFC assessment, in the comments section on "how and why the evidence supports your conclusions in items 1 through 5,' which were the five exertional categories in which he had rated Plaintiff, Dr. Whitley wrote: "history of tetralogy of fallot, s/p surgery age 2y and again 1/07, apparently has not had regular f/u with cardiologist recently, CE normal gt, FFM, 5/5 strength, h-t-t ok, 1/3/07 s/p resection of RV outflow tract muscle bundles and PV replacement." As the Commissioner notes, the fact that Plaintiff saw a cardiologist after the consultative exam and a few years into her disability process does not undermine Dr. Whitley's suggestion that her allegations were suspect because she was not undergoing regular follow-ups with a cardiologist prior to the

exam.  A lack of longitudinal treatment can undermine a claimant's allegations of disability.  *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).

In Part II of the RFC form, titled "symptoms," Dr. Whitley wrote:  "Clmt is partially credible as allegations are out of proportion to objective ME."  Plaintiff argues that Dr. Whitley failed to explain the basis for this finding and did not specify what about Plaintiff's complaints was out of proportion.  However, this statement, in the context of the earlier factual notations in Part IA of his RFC assessment shows that Dr. Whitley was relying on the medical evidence, which he found to be out of proportion with Plaintiff's complaints.

Finally, Social Security Ruling 96-6p addresses the consideration of administrative findings of fact by state agency medical consultants at the administrative law judge level of review on the issue of "medical equivalence."  Nowhere in her brief does Plaintiff argue that the medical evidence subsequent to Dr. Whitley's April 2, 2008 RFC assessment would have supported a finding that she met the criteria of an impairment in the Listings.

Thus, the ALJ's decision not to obtain an updated expert medical opinion is supported by substantial evidence, and the ALJ did not err by not obtaining an updated expert medical opinion.

## B.  RFC Analysis

Plaintiff contends that the ALJ erred because she did not include a detailed analysis of the evidence of Plaintiff's impairments, such as the severity of her congenital heart disease, her obesity, and her anemia, which Plaintiff argues were substantiated by the record.  Plaintiff reasons that, because the ALJ failed to demonstrate a full consideration of the evidence of Plaintiff's impairments that supported her position and to explain why she rejected the evidence favoring Plaintiff's position, the ALJ's decision should be reversed.  More specifically, Plaintiff argues that the ALJ did

not properly analyze Plaintiff's congenital heart disease in her decision, despite evidence of the severity of the impairment and that the condition had worsened, and did not discuss how her heart disease would have interacted with her obesity and anemia.

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a). The determination of a claimant''s RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at Steps Four and Five of the sequential evaluation process. SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p at *5. In addition, she "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id.*

Plaintiff argues that she underwent multiple diagnostic exams such as x-rays, echo cardiograms, and stress tests that determined that she had a mildly enlarged heart, 3-4/6 systolic and diastolic murmurs, pulmonary regurgitation, pulmonary hypotension, right ventricular hypertrophy, moderate hypokinesis of the septum, thinning walls, and mild to moderate pulmonary insufficiency. In support she cites generally several records that pre-date Dr. Whitley's RFC assessment, namely AR 207 (Jan. 2007), 209 (Jan. 2007), 217-21 (Dec. 2006), 281 (June 2005), 315 (July 2004), 317 (July 2004), 369 (Oct. 2006), and 397 (Mar. 2007). All of these records were available to Dr.

Whitley. As for the remaining citations to administrative record pages 444, 450-53, and 456-60, these are all pages from Dr. Shah's treatment records and the diagnostic testing that occurred after Dr. Whitley's RFC assessment and which the Court has addressed above.

The ALJ indicated that she gave weight to the reports of the state agency medical consultants as well as to other treating, examining, and non-examining medical sources and that "[t]he record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." AR 16. Although Plaintiff repeatedly lists a variety of disorders related to her congenital heart disease with a string of record citations throughout the history of her medical treatment, Plaintiff has not identified any physician, treating or otherwise, that supports the limitations she alleges.

As for Dr. Whitley's consultative RFC assessment, the ALJ gave the assessment "some" weight because he was non-examining but also because "there exist a number of other reasons to reach similar conclusions." AR 17. Not only did the ALJ discuss Dr. Whitley's assessment, the ALJ acknowledged and discussed the additional medical evidence that was received subsequent to Dr. Whitley's assessment, commenting that "those records show that the claimant is doing fine, with no subjective complaints or objective findings of shortness of breath, chest pain, orthopnea, or PND. Her complaints were of fatigue and tiredness. In addition, the cardiologist has not prescribed any medication for her heart condition, just iron pills." AR 17.

The ALJ also discussed all of Plaintiff's physical complaints that Plaintiff suggests are the physical manifestations of the listed disorders above, namely chest pressure, a "chest popping" feeling, chest pain, shortness of breath, and numbness and tingling down her left arm to her fingertips. Pl. Br., p. 8 (citing generally AR 32, 35-36, 232, 270-72, 274, 287-88, 328, 356-57, 368-

69, 374, 391, 411, 454, 456).  In her decision, the ALJ provided the following discussion of

Plaintiff's physical complaints:

> She required open-heart surgery.  Since that time, sometimes whenever she moves the wrong way, sneezes, or coughs her chest bone pops.  When she starts to move around too much like bending up and down or walking a lot she gets dizzy and short of breath.  At times, even when sitting she will become short of breath.  Whenever she picks up babies and hold[sic] them for too long or try[sic] to lift them up her chest starts to hurt and she feels drained.  She is easily tired.  Sometimes in the middle of the day, she has to stop what she is doing so she can lie down to take a nap before her children come home (Exhibit 3E).  At the hearing, the claimant testified that her main problem is fatigue.  She attested that she experiences shortness of breath 1-2 times a day.  She said that it feels like an elephant is sitting on her chest.  She said that she recovers in about 15 to 20 minutes from most of her symptoms when they occur.  As she reported, she just lies down and waits for the symptoms to subside.  She described the frequency of her problems as occurring only sometimes.
>
> The claimant further contends that she is easily tired and it becomes difficult for her to breath after one minute of walking.  She can climb 6-8 stairs before she experiences shortness of breath.  She is still able to do about anything that she did before her condition worsened, it just takes longer for her to complete certain tasks.  She normally had to break for a few minutes in between tasks.  She is unable to lift heavy objects as this produces a "popping" feeling in her chest (Exhibit 5E).  The medical record substantiates this allegation.  Status post surgery, on January 3, 2007, the claimant's treating physician placed her on restrictions of no lifting more than 10 pounds for 4-6 weeks (Exhibit 1E).  At the hearing, the claimant testified that she could lift up to 20 pounds; sit for 30-45 minutes; and walk one block, on a "good day".

AR 15.  The ALJ goes on to discuss Plaintiff's  physical symptoms when she was working as a

receptionist, that she had not yet seen a specialist regarding being tired who her doctor was going

to send her to see, her allegations of forgetting things, and that fatigue interferes with concentration.

Thus, the ALJ did not ignore Plaintiff's claimed symptoms.  Rather, the ALJ found Plaintiff not

entirely credible in light of the medical evidence.  (As discussed in the next section, the ALJ did not

err in her credibility finding.)

Plaintiff also contends that the ALJ's RFC determination is flawed because she failed to demonstrate how Plaintiff's cardiovascular impairment would have interacted with her obesity, Plaintiff's weight fluctuated between 155 and 170 pounds, with the most recent weight of 164 pounds. At a height of 5 feet, Plaintiff's body mass index ("BMI") registered between 30.3 and 33.2, with a most recent BMI of 32. A BMI greater than 30 is considered obese. SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). Social Security Ruling 02-1p requires an ALJ to consider obesity as an impairment and the exacerbating effects of a claimant's obesity on her other conditions, even if the obesity is not itself a severe impairment, when arriving at the RFC assessment. *Hernandez v. Astrue*, 277 F. App'x 617, 624 (7th Cir. 2008); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (finding that, even if obesity is not a severe impairment itself, and "merely aggravates a disability caused by something else; it still must be considered for its incremental effect on the disability, as the administrative law judge failed to do."); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Ruling 02-1p provides that, in evaluating obesity in assessing RFC, "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." SSR 02-1p, at *6. Further, Ruling 02-1p explains that an ALJ's RFC determination must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. *Id.* (citing SSR 96-8p ("Titles II and XVI: Assessing [RFC] in Initial Claims")).

While an ALJ should consider the effects of obesity together with the underlying impairments, s*ee Clifford*, 227 F.3d at 873; *Prochaska*, 454 F.3d at 736, the failure to explicitly consider the effects of obesity may be harmless error. S*ee Prochaska,* 454 F.3d at 736; *Skarbeck*,

390 F.3d at 504. Harmless error may be found when an ALJ does not explicitly address a claimant's obesity in the body of the opinion but adopts "the limitations suggested by the specialists and reviewing doctors, who were aware of [plaintiff's] obesity" into her RFC determination. *Skarbeck*, 390 F.3d at 504; *see also Prochaska*, 454 F.3d at 736-37. Additionally, if the plaintiff fails to provide specific evidence to show how obesity exacerbates the plaintiff's ability to work, the ALJ commits harmless error in not explicitly discussing it, particularly if such consideration would not affect the outcome of the case. *See Prochaska*, 454 F.3d at 737; *Skarbeck*, 390 F.3d at 504. The impact of a claimant's obesity on functioning is an "individualized assessment." SSR 02-1p.

In this case, the Court finds that the ALJ's failure to explicitly address Plaintiff's obesity was harmless error. *See Ruiz v. Barnhart*, 518 F. Supp. 2d 1007, 1023 (N.D. Ill. 2006). "No physician ever suggested, either implicitly or explicitly, that [Plaintiff's] obesity was exacerbating her physical impairments." *Id.* In *Skarbek*, the court noted that the plaintiff

> did not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk. Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were *aware* of Skarbek's obesity. Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctor's opinions.

*Id.* Like the plaintiff in *Skarbek*, Plaintiff's BMI of between 30.3 and 33.2 placed her in the lowest level of obesity recognized by the Social Security Administration, Level 1. *See Bellmore v. Astrue*, 2010 WL 1266494, *7. Also like in *Skarbek*, Plaintiff did not specifically claim obesity as an impairment, either in her application or at her hearing, and the references to her weight in her medical records should have been sufficient to put the ALJ on notice of the impairment. 390 F.3d at 504 (citing *Clifford*, 227 F.3d at 873). The ALJ adopted the limitations supported by the medical evidence of record, all of which noted Plaintiff's weight and height. Although Dr. Whitley's RFC

assessment does not mention Plaintiff's obesity, Dr. Whitley reviewed the medical evidence available in which her weight and height were indicated. *See Mueller v. Astrue*, No. 10 C 7080, 2012 WL 1802075, *22 (N.D. Ill May 17, 2012).

Without pointing to any medical evidence of record, Plaintiff argues in her brief that her obesity would have further taxed her heart, forcing it to pump harder and exacerbate her cardiovascular impairments such as her thinning cardiac walls, heart murmurs, and pulmonary regurgitation. Although Plaintiff's doctors consistently noted her weight, noting her obesity, continued weight gain, and attempts to lose weight in several treatment notes, none imposed any additional restrictions because of her weight. *See* AR 301, 322, 325, 327-28, 340, 343, 365, 366, 380, 417. Therefore, the Court finds that remand is not required because any failure on the ALJ's part to explicitly discuss Plaintiff's obesity in formulating her RFC was harmless error. *See Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011); *Richards v. Astrue*, 370 F. App'x 727, 733 (7th Cir. 2010); *Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504; *see also Hernandez v. Astrue*, 277 F. App'x 617, 624, 2008 WL 2025088, at *5 (7th Cir. 2008) ("Where the claimant herself is silent in this regard, we have repeatedly excused as harmless error the failure of the ALJ to explicitly address the claimant's obesity as SSR 02-1p prescribes so long as the ALJ demonstrated that he reviewed the medical reports of the doctors familiar with the claimant's obesity.").

Finally, Plaintiff argues that the ALJ did not discuss Plaintiff's anemia. She contends that the resulting weakness from her anemia limited her ability to do household chores and required her to perform other tasks at a reduced pace with frequent breaks. The Court finds that the ALJ's failure to specifically mention the word "anemia" does not constitute a failure to consider Plaintiff's symptoms or treatment for the anemia because the ALJ fully discussed Plaintiff's claims of fatigue

as well as the prescription for iron pills for the treatment of "low iron." *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (remanding, in part, because the ALJ failed to discuss how the plaintiff's headaches and blurred vision affected her ability to work and failed to include the headaches or blurred vision in the list of work-related impairments submitted to the VE). As with her congenital heart disease and obesity, the ALJ properly considered Plaintiff's complaints of shortness of breath, fatigue, chest pain, and dizziness and then discussed the medical evidence, concluding that the evidence does not support the extent of disability claimed by Plaintiff. The ALJ specifically noted several diagnostic test results, Plaintiff's medications and side effects, the assessment of Dr. Whitley, and that Plaintiff's cardiologist did not prescribe any treatment other than the continuation of the iron pills. The ALJ also noted that the only restriction placed on Plaintiff by her treating physician was a 10-pound lifting restriction for 4-6 weeks after her January 2007 surgery.

For all of these reasons, the Court finds that the ALJ did not err in the RFC determination.

### C. Credibility Determination

In her motion, Plaintiff argues that the ALJ failed to properly explain her credibility findings regarding Plaintiff's allegations as to the severity of her impairments, instead only providing a summary of the record and a conclusory analysis. In making a disability determination, the Commissioner will consider a claimant's statement about her symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id*. The Regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically

determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. 20 C.F.R. § 404.1529(a).

In doing so, the ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he or she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p, at *6. An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned

unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

In this case, Plaintiff asserts that her "cardiovascular impairment caused chest pain and pressure and tingling, shortness of breath, and pain in her left arm caused by exertion that required her to lie down for 4 to 5 hours a day to relieve the symptoms." Pl. Br., p. 13. In support she cites generally administrative record pages 30, 32, 35-36, 215, 222, 232, 272, 287-88, 403, 427, and 454. Overall, these pages confirm her subjective complaints of chest pain with many of the citations to a two-word notation of her complaint of "chest pain." The only references to lie down to relieve her symptoms are in Plaintiff's statements to the disability determination bureau consultative examiner in February 2008 and in her hearing testimony before the ALJ. Only her hearing testimony asserts that she has to lie down for four to five hours to relieve her symptoms.

Pages 30, 32, 35-36 are her own testimony. Page 215 is the January 2007 surgical pathology report and does not mention any of the symptoms or the need to lie down. Page 222 is a December 8, 2006 pre-operation "Cardiac Catheterization Report" that indicates that she was referred for progressive shortness of breath on exertion, but there is no mention of the other symptoms or the need to lie down. Page 232 is a December 8, 2006 "Pre-cardiac Catheterization Workup" that indicates in the narrative section that Plaintiff reported increasing fatigue, shortness of breath on exertion, and chest pressure and that symptoms resolve with rest. Page 272 is an April 18, 2006 chest x-ray report that lists her clinical history as "midsternal chest pain – shortness of breath." The impression of the x-ray was "no active cardiac or pulmonary disease with evidence of old granulomatous disease." AR 272. Page 287 is notes from Plaintiff's treating physician in Fall 2006, with a notation of "chest pain" on October 9, 2006, "cardiac consult pending" on October 23, 2006,

and no notation on December 13, 2006. AR 287. Page 288 contains six treatment notes with no reference to chest pain or other related symptoms on October 24, 2005, July 28, 2006, August 22, 2006, and September 26, 2006, but a notation on February 7, 2005 of a "cardiac work up pending" and a notation on October 5, 2006 of "chest pain." AR 288. Page 403 is a treatment note dated March 26, 2007, which indicates that Plaintiff complained of tingling and numbness in her left arm but reported no chest pain; the note also indicates her recent open heart surgery and notes her anemia (iron deficiency). Page 427 is the first page of the February 27, 2008 report of the consultative examination by Dr. Smejkal for the disability determination bureau, which indicates that Plaintiff complained of chest pain on the left side of her chest with a tightness feeling, shortness of breath, and pain that radiates to the left arm with tingling in the lower part of her arm. She also stated that she is fatigued all the time and has shortness of breath easily. She told the doctor that when she does "any house cleaning or daily living activities . . .she has to lie down and rest before she can even finish." AR 427. Finally, page 454 is the "Patient Health History" form that she filled out on April 4, 2008, when she began to see Dr. Shah after moving to the region. On the form, she indicated that she has chest pains and shortness of breath and that she has chest pains with exertion.

Plaintiff also argues that her anemia further exacerbated her fatigue, citing AR 271, 290, 404, and 411. Page 271 is a form dated March 23, 2007, with discharge instructions for follow-up for her anemia. Page 290 contains four treatment notes from April 17, 2007, to July 11, 2007, each of which notes her anemia, with the note on April 24, 2007 indicating "anemia improved." AR 290. Page 404 is an order form dated March 29, 2007 for a stool test for a diagnosis of "chronic blood loss anemic." AR 404. Page 411 is a treatment note from April 17, 2007, in which the doctor noted

her "iron deficiency anemia (s/p CV surg) and continued her on iron pills. As discussed previously, the ALJ acknowledged the evidence of her iron deficiency and that she was prescribed iron pills.

However, Plaintiff points to her testimony that she had headaches that would last for up to 4 hours and required her to lie down, that her children did the housework for her, and that she could only sit for 30 to 45 minutes, contending that all these facts limit her ability to perform activities of daily living. Plaintiff then cites, again generally, pages 207, 209, 222, 232, 271-72, 290, 381, 391, 396, 403-04, 411, 417, 427, 431, 444, 454 for the general statement that her "physicians consistently noted her complaints in the medical records, at one point even diagnosing her with chronic fatigue." Pl. Br., p. 13 (The diagnosis of chronic fatigue was made by Dr. Smejkal, the consultative examiner).

Plaintiff argues that the ALJ erred by noting that in recent treatment notes Plaintiff reported feeling fine but failing to note Plaintiff's other complaints of constant fatigue and that her tiredness had increased, citing generally to pages 29, 32, 28, 232, 301, 303,306, 317, 320, 393, 407, 416-17, 420, 427, 431, 444. Plaintiff argues that the ALJ selectively considered only those portions of the record that supported her position and ignored the evidence to the contrary and that the ALJ failed to demonstrate how Plaintiff's need to lie down and her fatigue were not credible in light of her impairments. In support, Plaintiff cites *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1045 (N.D. Ind. 2010); however, in that case, the ALJ failed completely to discuss the claimant's fatigue. That is not so in the present case. As noted in Part B above, the ALJ thoroughly discussed Plaintiff's allegations of fatigue.

In her credibility determination, the ALJ noted that Plaintiff alleged that she could not sit for 30-45 minutes, stand for 30 minutes, or walk more than one block but that Plaintiff also cooked,

grocery shopped weekly for 30-45 minutes at a time, socialized with friends, and attended church. The ALJ also noted that, at the time of Plaintiff's field office interview, the interviewer noted no problems breathing while standing, walking, or sitting. These daily activities, while not determinative, are properly considered factors. 20 C.F.R. § 404.1529(c)(3)(i) (explaining that other evidence, including daily activities, is an "important indicator of the intensity and persistence of [a claimant's] symptoms.").

The ALJ also explained how Plaintiff's allegations were inconsistent with the objective medical record as well as with her own most recent subjective reports to her treating physicians. Most notably, there are inconsistencies between Plaintiff's subjective complaints at the time of the hearing and her most recent reports to Dr. Shah, her cardiologist, for four successive quarterly visits, that she was not experiencing any chest pain, shortness of breath, orthopnea, PND, palpitations, syncope, pre-syncope, or transient ischemic attack. Again, the ALJ noted that no doctors have indicated the level of impairment argued by Plaintiff, and the treatment notes by Plaintiff's doctors do not support the claimed limitations. Unlike in *Accurso v. Astrue*, 2011 WL 578849, at *6 (N.D. Ill. Feb. 9, 2011), cited by Plaintiff, the ALJ did not simply list some medical evidence without explaining how the evidence supported the finding that the plaintiff was not credible. Similarly, this case is distinguishable from *Cuevas v. Barnhart*, 2004 WL 1588277, at *15 (N.D. Ill. Dec. 29, 2004), cited by Plaintiff, because Plaintiff's evidence that she needs to lie down is not "unrebutted" in light of the other evidence of record regarding her medical condition and treatment and her limitations.

Plaintiff also takes issue with the ALJ's treatment of her allegations of severe headaches. Unlike in *Indoranto*, a case in which the ALJ did not discuss the claimant's headaches at all, the ALJ

in this case did address Plaintiff's allegations of headache. The ALJ also acknowledged Plaintiff's testimony that she has headaches at least three times a day that last up to four hours but noted that there are no objective findings in the medical evidence of record that substantiate this allegation. The ALJ further cited to the examination in February 2008, which she noted indicated that the head was normocephalic and attraumatic. The ALJ also cited the evidence of record that on September 2, 2008, Plaintiff was seen at Community Hospital, complaining in part of headache, and noted that the head CT scan was unremarkable except for inflammatory changes in the paraspinal sinuses.

This is not a case in which the ALJ simply states that there is an absence of objective medical evidence in the record addressing the claimant's headaches; rather, the ALJ here discusses the objective medical evidence in the record that deals with Plaintiff's headaches but that does not support Plaintiff's claims. Plaintiff identifies no medical evidence in the record to undermine this conclusion. A discrepancy between the degree of symptoms "claimed by the applicant and that suggested by the medical records is probative of exaggeration." *Sienkiewicz*, 409 F.3d at 803-04l; *see also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (recognizing that "discrepancies between objective evidence and self-reports may suggest symptom exaggeration"). The ALJ also reasonably relied on the fact that Plaintiff's only medication was iron pills in concluding that her impairments were not as disabling as she alleged. *See Sienkiewicz*, 409 F.3d at 804 (finding the ALJ's credibility determination proper, including the observation that the claimant's treatment had been "routine and conservative").

Finally, Plaintiff argues that the ALJ's finding that her statements "are not credible to the extent that they are inconsistent with the above residual capacity assessment" is improper. *See Imbo v. Astrue*, No. 10-cv-3262, 2011 WL 3839676, at *3-4 (N.D. Ill. Aug. 26, 2011). Plaintiff argues

that this type of analysis is specifically prohibited by Social Security Ruling 96-7p and the case law. If the sentence cited by Plaintiff had encompassed the totality of the credibility finding in the ALJ's decision, it might indeed be improper. However, for all of the reasons previously discussed, it was not. In this case, the ALJ's credibility determination was not impermissibly conclusory, and reversal is not warranted. *See Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011).

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the relief requested in Plaintiff's Brief in Support of Her Motion to Reverse the Decision of the Commissioner of Social Security [DE 20] and **AFFIRMS** the Commissioner of Social Security's final decision.

SO ORDERED this 13th day of September, 2012.


s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record